# UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | 100 EAST FIFTH STREET, ROOM 540 | |
|---|---|---|
| Deborah S. Hunt | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed: November 14, 2019

Mr. Joshua Adam Blanchard
Blanchard Law
P.O. Box 938
Greenville, MI 48838

Ms. Patricia Gaedeke
Mr. Andrew Goetz
United States Attorney's Office
211 W. Fort Street
Suite 2001
Detroit, MI 48226

    Re:  Case No. 18-2246, *USA v. Miguel Martinez*
         Originating Case No. : 2:17-cr-20126-1

Dear Counsel,

  The Court issued the enclosed opinion today in this case.

                              Sincerely yours,

                              s/Cathryn Lovely
                              Opinions Deputy

cc: Mr. David J. Weaver

Enclosure

Mandate to issue

NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0570n.06

No. 18-2246

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellant, | ) ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| MIGUEL ANGEL MARTINEZ, | ) ) ) | COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| Defendant-Appellee. | ) ) | |

FILED
Nov 14, 2019
DEBORAH S. HUNT, Clerk

Before: ROGERS, BUSH, and LARSEN, Circuit Judges.

LARSEN, Circuit Judge. Following an interview with two special agents from the Federal Bureau of Investigation, Miguel Martinez was arrested and indicted for possession and distribution of child pornography. He asked the district court to suppress all statements made during the interview, arguing that he had been "in custody" for *Miranda* purposes but had not been given his *Miranda* warnings. The district court agreed and suppressed the evidence. We REVERSE.

I.

Martinez was a police officer with thirty-years' experience in the Detroit Police Department (DPD). In September 2016, a county sheriff's deputy in Nevada used a peer-to-peer filesharing program to download child pornography from an IP address assigned to Martinez's home in Trenton, Michigan. The deputy passed the information to the Detroit FBI office, and in February 2017 (while Martinez was on duty) federal agents executed a warrant to search Martinez's home. In conjunction with that search, the FBI decided to interview Martinez.

To ensure Martinez would not be armed during the interview, FBI agents coordinated with DPD to set up a ruse that would send Martinez to the Detroit Public Safety Headquarters during his shift. A DPD supervisor told Martinez "to report to [H]eadquarters for the purpose of transporting a sick or injured police officer." When Martinez arrived, two agents, dressed in plain clothes, asked Martinez whether he would help them with an investigation in Trenton, his hometown. Martinez agreed to help and went with the agents to a conference room in a separate portion of the Headquarters building. Reaching the conference room required taking a keycard-operated elevator to another floor and going through one set of keycard-secured doors. The agents had Martinez secure his firearm in a lockbox in the hallway outside of the conference room. FBI agents kept their own weapons with them during the interview but neither used or displayed them.

Martinez first sat down in a chair by the door, but the agents directed him to sit across the table, facing the door; the agents themselves took the seats by the door. They told Martinez that agents were executing a search warrant at his house in connection with a child-pornography investigation. They described how they had used Ares, a peer-to-peer filesharing program, to download child pornography from a shared folder linked to Martinez's IP address. The agents described how they had cross-referenced the Ares account's usage habits with Martinez's work schedule and discovered that the Ares user was active and online only when Martinez was not on duty.

Martinez acknowledged using the Ares software but claimed that he used it only to search for music. He admitted that he sometimes came across illicit files, but he would immediately delete them when he did. The agents did not buy this story. When Martinez tried to downplay the nature of his downloads, the agents showed him graphic screenshots of the child-pornography videos they had downloaded from his Ares shared folder.

Throughout the conversation, both agents used a cordial and nonconfrontational tone. The agents did not handcuff Martinez or physically restrain him in any way. They also said repeatedly—nine times in total, on average once every nine minutes—that Martinez was speaking with them voluntarily, was not under arrest, or that he had the right to leave anytime he wished. Martinez's own comments likewise indicated that he understood he was free to go and was not under arrest. *See, e.g.*, Audio at 9:00–02 (Agent Fitzgerald: "I can't force you to talk to us." Martinez: "Right.").

The interview, of course, was not entirely enjoyable for Martinez, who, after all, had just been informed that his house was being searched for child pornography. He repeatedly expressed sadness that he would lose his police job and wished he could just go back and "work [his] shift." He was also concerned about the inevitable embarrassment that would accompany child-pornography charges—asking repeatedly which of his coworkers knew about the investigation and pleading for the agents to keep him off the local news. Martinez allowed one of the agents to look through his cell phone during the interview but refused to share his computer password so that the agents at his house could easily unlock his computer.

After concluding the interview, one of the agents went to another room and called the federal prosecutor assigned to the case, who instructed him to arrest Martinez. The agent returned to the conference room and told Martinez he would be arrested after all, but the agents allowed him to use the restroom and make phone calls before handcuffing him.

A grand jury indicted Martinez for receiving, possessing, and distributing child pornography, all in violation of 18 U.S.C. § 2252A(a)(2). Martinez moved to suppress the statements he had made during the interview, arguing that he had been in custody for *Miranda*

purposes but had not been given *Miranda* warnings. After an evidentiary hearing, the district court agreed and suppressed the evidence. The government appealed.

II.

We review the district court's factual findings for clear error. *United States v. Bailey*, 302 F.3d 652, 656 (6th Cir. 2002). "A factual finding is clearly erroneous when the reviewing court is left with the definite and firm conviction that a mistake has been made." *United States v. Smith*, 263 F.3d 571, 581 (6th Cir. 2001) (citing *United States v. Ayen*, 997 F.2d 1150, 1152 (6th Cir. 1993)). Because Martinez prevailed below, we also draw all reasonable factual inferences in his favor. *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009). But the bottom-line question—whether Martinez was "in custody" during the interview—is a mixed question of law and fact that we review de novo. *United States v. Levenderis*, 806 F.3d 390, 399 (6th Cir. 2015) (citing *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998)).

If a suspect is in police custody, officers must clearly inform him of his *Miranda* rights before questioning him. *Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966). If they do not, they may not use the resulting evidence in a subsequent prosecution. *Id.* at 444. A person may be "in custody" while not actually under arrest. "'[C]ustody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508–09 (2012). "In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of 'the objective circumstances of the interrogation,' a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" *Id.* at 509 (alteration in original) (quoting *Stansbury v. California*, 511 U.S. 318, 322–23, 325 (1994) (per curiam), and *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). To determine "how a suspect would have 'gauge[d]' his 'freedom of movement,' courts must examine 'all of the circumstances

surrounding the interrogation.'" *Id.* (alteration in original) (quoting *Stansbury*, 511 U.S. at 322, 325).

The ultimate question is "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* Four considerations have particular relevance: "(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told he or she did not need to answer the questions." *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010) (citations omitted). But this list is not exhaustive, and no single factor is determinative. *United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2003). The district court recited the *Hinojosa* factors and concluded that "these factors weigh in favor of a finding of custody." We disagree.

A.

Whether investigators inform a suspect that he is free to leave or to refuse to answer questions is the most important consideration in the *Miranda* custody analysis. *Howes*, 565 U.S. at 515 ("Most important, respondent was told at the outset of the interrogation, and was reminded again thereafter, that he could leave and go back to his cell whenever he wanted."); *see also Swanson*, 341 F.3d at 530; *United States v. Holt*, 751 F. App'x 820, 824 (6th Cir. 2018). We have even said that such assurances "likely would . . . guarantee[] the noncustodial nature of" some interviews. *Panak*, 552 F.3d at 468.[1] This makes sense, since the *Miranda* custody determination

---

[1] Our sister circuits attach the same weight to such statements. *See United States v. Ambrose*, 668 F.3d 943, 958 (7th Cir. 2012) ("The circumstances surrounding the interview were therefore not indicative of custody, but if any doubt remained it would have been dispelled when, as the district court found, Fitzgerald informed Ambrose that he was not under arrest."); *United States v. Perrin*, 659 F.3d 718, 721 (8th Cir. 2011) ("Most importantly, about ten minutes beforehand, Agent Scherer had told Perrin and the three other residents present that they could leave and did not have to answer questions if they stayed. We have long regarded these admonitions as weighty in the

-5-

is an objective test; the ordinary person who is told he is free to leave will usually understand that to be the case.

This most important factor cuts heavily against Martinez's argument that he was in custody. The FBI agents told Martinez at least *nine* times—on average, once every nine minutes—that he was meeting with them voluntarily and could leave at will. The agents were clear that Martinez had the right to speak with an attorney and that they would not "play games with that." A reasonable interviewee, told nine times that he was not in custody and could leave at will, would generally understand just that.

The district court erred as a matter of law when it discounted these warnings. Despite acknowledging that the agents "repeated phrases like 'you're here voluntarily' and 'we never said you can't leave,'" the district court curtly dismissed that evidence: "But [the FBI agent] doth protest too much. Anyone who listens to even a few minutes of the recording can hear the desperation in Mr. Martinez's voice, signaling that he was there against his will." In minimizing the agents' statements—or perhaps even counting them as evidence of *Miranda* custody—the district court erred. Explicit warnings that an interviewee may leave at any time do not become less valid with repetition. If anything, they become more so.

---

custody analysis. *And we have never held that a person was in custody after receiving them*." (emphasis added) (citations omitted)); *United States v. Bassignani*, 575 F.3d 879, 886 (9th Cir. 2009) ("We have consistently held that a defendant is not in custody when officers tell him that he is not under arrest and is free to leave at any time."); *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004) ("We have observed that '[t]he most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will.'" (alterations in original) (quoting *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990))); *United States v. Crawford*, 372 F.3d 1048, 1060 (9th Cir. 2004) ("Perhaps most significant for resolving the question of custody, Defendant was expressly told that he was not under arrest . . . .").

-6-

The district court also erred when it concluded that "the desperation in Mr. Martinez's voice" indicated "he was there against his will." Martinez's subjective state of mind is not relevant to the objective custody analysis. *United States v. Ray*, 803 F.3d 244, 266 n.12 (6th Cir. 2015) (*Miranda*'s custody "test does not involve consideration of the particular suspect's 'actual mindset.'" (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 667 (2004))). "Whether a person is in custody for *Miranda* purposes is determined by neither the perception of the defendant nor of the police. It is determined by the objective perception of a reasonable man in the defendant's shoes." *United States v. Galloway*, 316 F.3d 624, 629 (6th Cir. 2003) (citing *Stansbury*, 511 U.S. at 323). Martinez's statements are pertinent only to indicate "the overall atmosphere of the entire interaction" and how a reasonable person would perceive it. *United States v. Patterson*, 826 F.3d 450, 458 (7th Cir. 2016). Having reviewed the recording ourselves, we come away with the definite and firm conviction that the district court was mistaken when it concluded that any "desperation" in Martinez's voice indicated "he was there against his will."

For example, the district court observed that "[a]t least twelve times, Mr. Martinez told the Agents that he wanted to leave and go work his shift" (emphasis omitted). This overstates what Martinez said. True, he made frequent comments about how he "would love to go back tonight and work [his] shift" or "would love to be back on the street." But the interview overall makes clear that these statements reflected Martinez's growing realization that he would not be able to continue a career he loved. He punctuated the interview with comments like, "Damn, this looks like I'm never going to go back to work now," and "Look at me. I'm fired. . . . I just want to be there, on patrol." And he voiced his wish that he could "keep working" while the agents completed their investigation. The "desperation" in his voice, to the extent there was any, also arose in part from his concerns about being viewed as a pedophile; he adamantly denied "want[ing] to be with

-7-

a little girl" and worried that "people are going to think that I'm out there trying to screw kids." But there is nothing in the tone or substance of what Martinez said that indicates he was participating in the interview against his will.

In sum, the agents told Martinez early and often that he was meeting with them voluntarily, was not under arrest, and could leave at any time. By itself, this cuts heavily against *Miranda* custody. Nothing else in the conversation undercuts the strength of that evidence. The district court's finding that Martinez asked to terminate the interview multiple times was clearly erroneous. And to the extent the district court considered Martinez's subjective state of mind, that was improper as well. Accordingly, this *Hinojosa* factor weighs heavily against custody.

B.

None of the other considerations listed in *Hinojosa* leads us to find *Miranda* custody despite the agents' repeated assurances that Martinez was not in custody. One factor we consider is the location of the interview. *Hinojosa*, 606 F.3d at 883. Martinez, the district court found, "was unfamiliar" with Headquarters and "had only visited a couple of times." But most significant to the district court was that Martinez "did not voluntarily appear at Headquarters"; he was instead sent over in "a ploy to secure his appearance" at the interview. We agree that Martinez's unfamiliarity with the location and the agents' use of a ruse weigh in favor of *Miranda* custody, but the district court overstated the importance of these facts, especially the ruse, to the overall analysis.

Martinez's supervisor ordered him merely to go to Headquarters; he did not direct Martinez to speak with the agents. A reasonable person would not understand an order to go to Headquarters to pick up an injured officer to be a command that he must speak with the FBI agents he ultimately encountered. *See United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (stating that it was

-8-

"simply of no moment that Mahan had been summoned to the interview by one of his supervisors at work," because it did not "even remotely constitute[] a restraint on the freedom of movement to the degree associated with formal arrest"); *see also United States v. Laurita*, 821 F.3d 1020, 1026 (8th Cir. 2016) ("The use of deception is irrelevant unless it relates to a reasonable person's perception of his freedom to depart.").

The FBI agents' ruse weighs only modestly in favor of custody. The *Miranda* analysis is not concerned with the fact that any ruse is, by definition, dishonest. The ruse is relevant for *Miranda* purposes only to the extent that it would make a reasonable person in Martinez's position feel compelled to remain and answer the agents' questions. *See Loza v. Mitchell*, 766 F.3d 466, 480 (6th Cir. 2014) ("Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." (quoting *Illinois v. Perkins*, 496 U.S. 292, 297 (1990))). Martinez doubtlessly felt some psychological pressure to answer the agents' questions when he realized that they had tricked him into coming to an unfamiliar location so that they could interrogate him. Still, nothing about the ruse indicated that the agents would prevent him from leaving the conference room or attempt to force him to speak. Absent additional facts that bear more directly on whether a reasonable person in Martinez's position would have felt free to leave, the agents' ruse on its own cannot establish *Miranda* custody.

Our conclusion that the FBI agents' ruse does not weigh strongly in favor of custody accords with the Seventh Circuit's analysis in *United States v. Ambrose*, 668 F.3d 943 (7th Cir. 2012), which dealt with a nearly identical ploy. The defendant in *Ambrose*, a Deputy U.S. Marshal, was told by his supervisor to report to an FBI building for a meeting concerning a fugitive. *Id.* at 951. As he entered the building, the defendant had to surrender his weapons and cellphone at a

-9-

No. 18-2246, *United States v. Martinez*

guardhouse. *Id.* After being ushered to a conference room, two federal agents confronted the defendant with evidence against him and began to question him. *Id.* at 951–52. The court found that the defendant was not in *Miranda* custody during this questioning, *id.* at 958, even though "[h]e was drawn there through a ruse," *id.* at 956. Although the court found that the ruse weighed in favor of finding *Miranda* custody, it deemed the ploy "hardly dispositive of the matter." *Id.*; *see also United States v. Martinez*, 602 F. App'x 658, 659 (9th Cir. 2015) ("We are mindful that the officers used a ruse to convince Martinez to come to the interview, but '[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns.'" (alteration in original) (quoting *Perkins*, 496 U.S. at 297)).

The FBI agents led Martinez to an unfamiliar location under false pretenses, but nothing about the location of the interview suggested that, once there, Martinez was not free to leave. This factor therefore weighs only slightly in favor of custody.

C.

*Hinojosa* tells us to look next at "the length and manner of the questioning." 606 F.3d at 883. The district court found that the length of the interview (eighty minutes) was not itself problematic. We agree. Nevertheless, said the district court, "one need only listen to the recording to determine that the Agents' manner of questioning, albeit 'cordial,' was relentless and accusatory. They repeatedly called Mr. Martinez's story bullshit . . . ." Again, however, the audio recording itself leaves us with the definite and firm conviction that these factual findings were mistaken.

The questioning was hardly "relentless"; there were stretches of silence in which the agents asked no questions at all until Martinez (obviously coming to terms with the end of his law

-10-

enforcement career) broke the silence and started thinking out loud. For example, without any question to prompt him, Martinez attempted to explain away his computer's contents—saying that sometimes he would download lots of files and leave the house, and would delete any illicit files as he came across them later. At another point—again, without prompting—he volunteered that he is a "good guy" and "didn't do any of this stuff with malice or intent."

The interview might be described as "accusatory" in the sense that the agents believed Martinez had committed crimes and laid out the evidence they had against him. But that is not enough to create custody: "*Miranda* warnings are not required simply . . . because the questioned person is one whom the police suspect." *Levenderis*, 806 F.3d at 400 (alteration in original) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)); *see also United States v. Saylor*, 705 F. App'x 369, 374–75 (6th Cir. 2017) ("We have never held . . . that a noncustodial conversation may be transformed into a custodial interrogation simply by virtue of the fact that police confronted the defendant with evidence of guilt."). A statement by an officer that he believes the suspect is guilty is relevant only to the extent that it "affect[s] how a reasonable person in that position would perceive his or her freedom to leave." *Stansbury*, 511 U.S. at 325. We have previously found no *Miranda* custody where, as here, a federal agent confronted the defendant with images of child pornography downloaded from his computer and, unlike here, even informed the defendant that the Government was going to prosecute him. *Salvo*, 133 F.3d at 953. In this case, the tone of the conversation remained calm and noncombative, and we would certainly not describe it as so "relentless" or "accusatory" that it would lead Martinez to believe he was not free to leave.

It is true that one of the agents called Martinez's answers "bullshit" on one occasion—but this did not happen "repeatedly," as the district court found, and the agent's tone was not hostile or agrressive. And even so, using such language does not strongly support a finding of custody in

-11-

these circumstances; both Martinez and the agents casually swore throughout the interview in a joking sort of way, and Martinez was the first to do so. Further undercutting the district court's findings in this regard was the respect with which the agents conducted the interview. They told Martinez over and over that they admired his thirty years of DPD service; offered him the chance to satisfactorily tell his "side" of the story; explained that they had interviewed him at Headquarters rather than at Martinez's usual post because they did not want to embarrass him in front of his coworkers; and said they would have preferred to interview him at his house if they could have done so.

Martinez's own statements during the interview similarly cut against the district court's conclusion. He told one of the agents that the agent seemed like a "good guy" and that he could "respect him"; he mentioned that he would have enjoyed challenging the agents to a game of pool in his basement if the interview had been at his house; and he repeatedly joked around with the agents. And toward the end of the interview, when Agent Nichols said he had no more questions for Martinez, Martinez replied: "I don't want you guys to leave man, I kind of like talking to you, hanging out with you guys." Of course, Martinez's state of mind is not directly relevant to whether he was in *Miranda* custody, but these statements can be evidence of how a reasonable person would have perceived the situation. *Patterson*, 826 F.3d at 458. This was a friendly, albeit uncomfortable, interaction—not an inquisition. Accordingly, we find clear error in the district court's factual findings. The manner and tone of the agents' questions do not weigh in favor of *Miranda* custody.

### D.

We look also to whether Martinez's freedom of movement was restricted to the degree associated with a formal arrest. *Howes*, 565 U.S. at 515; *Hinojosa*, 606 F.3d at 883; *Holt*, 751 F.

No. 18-2246, *United States v. Martinez*

App'x at 824.  The district court found that Martinez was "confined to a conference room in which two armed FBI agents were seated between him and a closed door."  Although this fact points slightly in favor of custody, that is not nearly enough, and other facts reveal that Martinez's freedom of movement was not significantly restricted.  The interview took place in a large conference room, and Martinez was not handcuffed until his later, formal arrest.  *See Howes*, 565 U.S. at 515 ("[R]espondent was not physically restrained or threatened and was interviewed in a well-lit, average-sized conference room, where he was 'not uncomfortable.'").  There is no evidence that Martinez was not free to move about the room.  Furthermore, one agent offered uncontradicted testimony that although the conference doors were closed, they were unlocked.  *See Levenderis*, 806 F.3d at 400 ("Defendant stresses the fact that the room was small and the agents sat closely around his bed while they questioned him.  However, there is also no evidence agents prevented him from getting up from his bed."); *Mahan*, 190 F.3d at 422 (fact that "both interview rooms were unlocked" weighed against finding of custody).  Both agents were armed, but they never brandished their weapons or even showed them to Martinez.  *See United States v. Crossley*, 224 F.3d 847, 861–62 (6th Cir. 2000) (fact that officer "did not have his gun drawn" weighed aganst finding of custody), *superseded by statute on other grounds*.  And the agents were wearing business suits, not tactical gear or other intimidating clothing.  *See Ambrose*, 668 F.3d at 957 (fact that federal agents "both were in business attire" weighed against finding of custody).

Also relevant to this factor is whether the agents isolated Martinez from the outside world.  *Howes*, 565 U.S. at 512 ("[I]solation may contribute to a coercive atmosphere by preventing family members, friends, and others who may be sympathetic from providing either advice or emotional support."); *Coomer v. Yukins*, 533 F.3d 477, 486 (6th Cir. 2008) (explaining that "*Miranda* concerned 'the principal psychological factor' of 'isolating the suspect in unfamiliar

surroundings'" (quoting *Beckwith v. United States*, 425 U.S. 341, 346 n.7, 347 (1976))). Martinez is right that the officers asked him to turn off his police radio at the outset of the interview. Listening to the recording, however, makes clear why the agents made this request—the radio traffic was so loud it was interfering with their conversation. A reasonable person in Martinez's position would not have perceived this request as an attempt to isolate him. The agents told Martinez he could "absolutely" check his personal text messages during the interview. *See United States v. LeBrun*, 363 F.3d 715, 722 (8th Cir. 2004) (en banc) (stating that the "mere possession of a cellular phone . . . is relevant to the question of whether . . . a reasonable person in the same circumstances would feel restrained"); *cf. Levenderis*, 806 F.3d at 400–01 ("Defendant was also able to place and receive phone calls during the interviews, something a reasonable person in police custody would not feel free to do."). And after the interview concluded, Martinez was allowed to go to the bathroom and make two phone calls before he was formally arrested. These details, which the district court did not discuss, weigh against custody.

The district court instead focused its attention on Martinez's request for water, finding that "[w]hen [Martinez] asked if he could get water, . . . the two Agents looked at each other, Agent Fitzgerald shook his head 'no,' and Agent Nichols went to retrieve the water on his behalf." This particular interaction does weigh in favor of custody.

But on whole it was error to conclude that Martinez's freedom of movement was restricted to the degree associated with a formal arrest. Considering the absence of physical restraints and Martinez's ability to communicate via cell phone, a reasonable person would not have felt significantly restrained.

-14-

E.

In sum, the agents' ruse and Martinez's unfamiliarity with the Headquarters building tip slightly in favor of custody, as does the agents' decision to confront Martinez with graphic still images of child pornography taken from his Ares folder and their refusal to let him exit the room to retrieve water himself. But the length and manner of the questioning, as well as the absence of restraints, cut strongly against *Miranda* custody. Martinez voluntarily agreed to speak with the agents; the interview's length (eighty minutes) was not too long under these circumstances; Martinez was not handcuffed or physically restrained; Martinez was free to contact others outside the conference room by text message; and Martinez was able to go to the bathroom and make two phone calls before being formally arrested. Even without considering the agents' assurances, we would likely conclude the interview was noncustodial. But the agents' repeated statements that Martinez was speaking to them voluntarily and was free to leave dissolve any remaining doubt. Under these circumstances, the fact that the FBI agents told Martinez nine times that he was not under arrest, was there voluntarily, or was free to leave weighs heavily in favor of non-custody. The district court either discounted the evidentiary value of these statements or considered them evidence of *Miranda* custody ("But he doth protest too much"). Either approach would have been legal error. The totality of the circumstances, giving appropriate and substantial weight to the agents' clear and frequent assurances, tells us that Martinez was clearly not in custody during this interview. Accordingly, suppression was not warranted.

\* \* \*

For the foregoing reasons, we REVERSE the district court's suppression order.